# SARATOGA OYER AND TERMINER.

## THE PEOPLE agt. AUGUSTUS H. PEARSALL.

Where the *date* of a trip by witness to a certain place is material, on the trial of a civil action, it is not material whether the witness, swearing on that subject, knew that the hotel where he staid kept a register. Therefore, although he swore intentionally false on the trial that he did not know such hotel kept a register, yet he was not guilty of perjury (*see* 3 *Parker*, 510).

Where a witness states a transaction occurred on a given *date*, he has no right to confirm or corroborate his evidence by showing a paper made and signed by him at that date.

In this case it was *held*, that a witness called for the defense on cross-examination could not be asked whether he had not made a statement out of court inconsistent with what he had now sworn to in court (*see* 50 *New York*, 392; *also Schell* agt. *Plumb, ante, p.* 11).

*September Term*, 1873.

THE trial of this case commenced at the Saratoga oyer and terminer September 25th, 1873, justice JOSEPH POTTER presiding.

The indictment charged the defendant, Pearsall, with perjury in giving evidence on the trial of the civil action of John H. Bullard against said Pearsall at the Saratoga circuit in January, 1871.

On the 17th of July, 1868, Pearsall sold to Bullard, the plaintiff in that action, one-eighth of a patent for a stone-drilling machine invented by one Charles W. Hermance, and the patent by him assigned to said Pearsall, J. Howard Thompson, Ostrander, and Finne, one-fourth being owned by each.

The sale was made upon the representation that the invention and machine was of great value; that the machine had

been exhibited and tested at the state quarries at Granville, Washington county, N. Y., by Pearsall and Thompson, and that Thompson would not take $10,000 for his quarter interest in it.

Thompson was examined as a witness before the Saratoga county judge, March, 1870, and his testimony perpetuated at the instance of the plaintiff, and then testified that he and Pearsall went to Granville and exhibited said machine, but it did not operate satisfactorily, and that on his way home he told Pearsall that he would like to sell out his share for $2,000, being $1,000 less than he gave; and that he thought it was the last of June, 1868, when they so went to Granville, and that he was never there but on that one occasion.

The indictment charged that it was a material question to determine on the trial of said civil action whether the said machine was exhibited to Granville before July 17th, 1868, when the sale was made to Bullard, and whether Pearsall registered his name at the hotel; and that the defendant was sworn on said trial in his own behalf and testified falsely, as follows:

" That the said Pearsall and said Thompson went to Granville, Washington county, on the twenty-fourth day of July, in the year of our Lord one thousand eight hundred and sixty-eight, and exhibited the stone-drilling machine; that he never went to Granville with said Thompson on but one occasion; that he did not exhibit said drilling machine at Granville with Thompson before the said sale to said Bullard; that Thompson did not tell said Pearsall before the said sale by said Pearsall to said Bullard; that said Thompson would sell his interest in said patent for $2,000; that the said Pearsall had not been to Granville aforesaid with said Thompson to exhibit said machine before the said sale by said Pearsall to said Bullard; and that the said Pearsall, in answer to the question whether he registered at the hotel at Granville aforesaid, answered that he did not know as they had a register."

On the trial of the indictment the prosecution proved the proceedings in the civil action, and that the prisoner testified as charged in the indictment.

The prosecution also proved, by Bullard, that when he bought, Pearsall told him that he and Thompson had exhibited the said machine at Granville as alleged in the complaint in the civil action; and that Thompson would not take $10,000 for his interest, or that Thompson considered the invention worth $50,000.

William Johnson, of Hartford, Washington county, testified that he knew the parties; that he resided about six miles north of Argyle; that when he and his wife were returning home from Argyle, they met Pearsall and Thompson returning from Granville with said drill machine; that he stopped and looked at it and talked with them about the machine; that it was either July 16th, 1868, or about three weeks before that time when his wife went to order a bonnet from Argyle; that he had, and then produced his book in which he had entered that he got the bonnet July sixteenth, but had not entered the prior date when he went to order it; that he thought it was on the first trip that he so met them, but was positive it was on one of those trips.

William E. Jones testified that he was foreman of the Granville slate works, and saw the machine experimented with then by Pearsall and Thompson in the summer of 1868; thinks it was the latter part of June, but made no memorandum of the date.

Franklin L. Wheeler testified that he was clerk of the hotel kept at Granville in June, 1868, and had been since until 1872; produced the register kept at said hotel. The prosecution offered to prove by this witness that the prisoner's name, in company with Van Vandenburgh, was upon this register under date of May, 1868, in the handwriting of the prisoner; that prisoner's name was not upon the register under the date of July, 1868; and that the leaf of the register containing the entries for June, 1868, had been cut out

by some person to him unknown; that about January 1st, 1871, and about two weeks before the civil case was tried, the prisoner drove about thirty miles from his residence to said hotel and called for said register; that the witness looked it up and furnished it to the defendant; that he took dinner at the hotel that day, but did not register or disclose his name or business, and the witness did not then recollect him; that the witness did not watch the defendant, and could not, therefore, tell whether or not he abstracted the leaf for June; that after the defendant left the witness put the old register away; that after the trial of the civil action Bullard went over to see said register, and the witness then got it and found that the June leaf had been abstracted.

The counsel for the defense objected to the above evidence. The court decided that it was not material whether the defendant had registered his name in June, or whether the witness knew such register had been kept, when he testified two weeks after that " he did not know as they had a register."

The prosecution cited *People* agt. *McKimey* (3 *Parker*, *C. R.*, 510); and claimed that such evidence was circumstantially material on the trial of the civil action; and secondly, it was competent to show that the prisoner had made no mistake when he testified to July as the date of the trip to Granville; that he gave such testimony deliberately, and after a trip of thirty miles to examine that date. The court sustained the objections and excluded the evidence offered, and stated that the prosecution could except, if they did not think the decision was correct. The counsel for the prosecution stated that such exception would be of no avail in a criminal trial.

Homer H. Inglesbee testified that he resided on the farm next north of William Johnson; that he remembers the occasion when Pearsall with another man passed south with the drill in a wagon in the summer of 1868; that he was then engaged in getting in hay from a small clover field;

that he finished that field on Saturday, and on that day one Draper called for him to go to Sandy Hill with him, and he promised to do so as soon as he got the haying done in that field; that he did meet Draper at the law office of U. G. Paris on the Monday following, June twenty-ninth, and then made a contract with him which the witness offered to produce, which was objected to by the defendant's counsel. The counsel for the prosecution offered to produce said paper and show that it was dated June 29th, 1868, signed by the witness, and that it was dated the day he was at Sandy Hill with Draper. This was objected to and excluded by the court.

Several other witnesses were called by the prosecution, who testified to facts tending to show that said trip to Granville was made by the prisoner and Thompson in June, 1868.

On this trial the defendant testified that he received the drill from the boat at Schuylerville, June 24th, 1868, and started for home; before he got there he turned about and took it back and left it in Hermance's barn until July eleventh, when he went and took it home.

Charles W. Hermance was sworn for the defendant, and testified that on the 24th day of June, 1868, he found a drill machine had been left in his barn at Schuylerville, and that it remained there until July 6th, 1868, when he went to Troy, and on the 11th of July, 1868, returned from Troy and found said drill had been taken away. On cross-examination he stated that he was examined on this subject in Troy, February 21st, 1871. The prosecution offered to prove that the witness did not produce any memorandum on that occasion, but stated that he had one at home which he would exhibit to such person as counsel should appoint. Objected to and excluded. The witness testified that on the 27th day of February, 1871, Daniel A. Bullard did call upon the witness for that purpose at Schuylerville.

The following question was then put to the witness: "Did you then and there (February 27th, 1871) state to

him (D. A. Bullard) that upon reflection, since you had been examined in Troy, you were satisfied that the drill that came to your barn in Schuylerville was painted and altered by you, and that Ostrander and Finne took it to Ballston to see what they could get it made for, and that such drill did not go to Pearsall's, and it never went there; and you did not remember about the drill that went to Pearsall's, but you knew it never came to your house; that you never saw that drill and did not know anything about it? Objected to by defendant's counsel and excluded by the court.

E. F. BULLARD, *for prosecution.*
E. L. FURSMAN & J. P. BUTLER, *for defense.*

The evidence being closed, the court gave the following charge to the jury:

GENTLEMEN OF THE JURY: The case before you is an indictment against Mr. Pearsall. It is alleged in the indictment that at a court held at this place, in 1871, an action was tried in which Pearsall was defendant, and John Bullard plaintiff; that Pearsall was sworn, in due form of law, as a witness upon that trial, and that he then testified, falsely and corruptly, to material matter under consideration in that case. The charge is a very serious one, and demands your cautious, candid consideration. So far as appears from anything connected with this case, the complainant is a respectable man, and he brought that action to recover what he claimed was rightfully due him by reason of a sale of an interest in a patent right. The defendant, aside from what is here alleged, appears to be a respectable man, occupying a respectable position in society, and a man of good standing.

The crime of perjury is a base crime, involving not only serious consequences in the way of punishment to the person committing it, but it evinces a degree of depravity and turpitude far exceeding that of many other crimes.

To make out a case of perjury, it is necessary that the people allege and prove that there was a legal proceeding in

which it was proper, competent and necessary to administer an oath, and that an oath was administered, and that the person to whom it was administered testified willfully and corruptly to that which was false, and that it was matter material to the issue to be determined upon such trial.

In regard to some of the facts necessary to make out this case on the part of the people, there is not much controversy.

From the documentary evidence offered, it appears that the action was brought against Pearsall by Bullard, the issue came to trial, and that the plaintiff failed to establish the allegations and did not recover. Some of the things transpiring upon the trial have been proven before you. That an oath was administered is proved, and I have held, as matter of law, that it was properly administered by the clerk; that he had competent authority to do it, and that it was done in due form. The other matters are more or less in controversy. You are to decide not only in relation to the testimony the defendant gave upon that trial, but also whether it was given corruptly, willfully, intentionally, understandingly. To illustrate: A person may swear to a thing entirely untrue, and yet not be guilty of perjury in the least degree, for he may testify to it under a mistake. It must be done willfully; the person testifying must have knowledge that what he is testifying to is untrue. Oftentimes it happens on the trial of causes, perhaps in this very trial, unintentionally of course, that things are sworn to that are untrue, and yet the person so testifying, if it is not done willfully and knowingly, is not guilty of perjury. From the conflict of testimony, from the disagreement of witnesses as to time and circumstances, it is evident that mistakes are made. Therefore, you will see that it is necessary that the party must testify corruptly to what is false. It is claimed that there is evidence here that will support that element in this case, in the fact that the defendant was testifying in a cause wherein the plaintiff sought to recover money he had paid to him for a worthless article.

You must also pass upon the materiality of the evidence

given. A man cannot be convicted of perjury unless the matter he testified to was material to the issue. If a witness should state under oath fifty things that have no relation to the matter in dispute between the parties, and although every one of those fifty things were untrue to his knowledge and he state them willfully, yet, the matter not being material, it is not perjury. The matter testified to in this case was of this character. Bullard had purchased of the defendant an interest in a patent right and paid him $1,500 therefor; and afterwards, becoming dissatisfied with the bargain, or thinking he had been imposed upon or defrauded, or that the article was not of any value, brought an action against Pearsall to recover what he had paid him. In his complaint he alleged that Pearsall, on the occasion of, and before, and during the negotiations which resulted in the sale of this interest in the patent right, represented to him that the article was a good thing; and he also alleged that it was represented that the machine had been tried at Granville, and it did not prove a success there, as they were not satisfied with its operation, and no sales were made, and it was claimed that those things constituted a cause of action against Pearsall, if the represent- ations were made by him as an inducement to the purchase, and were in fact untrue to his knowledge. It was necessary. that Bullard should prove those allegations in order to have a recovery in that action. A portion of the evidence and charge have been read here, from which it appears that one of the things relied upon in that action was whether the defendant said the drill was a good thing. If that was intended as a representation that the drill was a useful thing, that it had intrinsic value and would answer a useful purpose, and that was believed by Bullard, the person making the purchase, to have been so intended, the representation in that sense, and it was not so, Pearsall knowing that it was not so, then that representation would be a material matter. You will observe that in saying this, he does not state any particular quality that this machine had, how much work it would perform; he

simply represents it to be a good thing. In that case, perhaps, it was properly left to the jury to say whether a man saying it was a good thing meant that it was a valuable thing; that it had intrinsic merits and would perform work economically. It is for the jury to determine what such a remark meant. If it was such a remark as merchants or others having property to sell are apt to make, that it is a good thing and worth so much, that there is a scarcity of the article; if it was simply the expression of an opinion or merely a representation without intending to assert any particular fact in relation to it, that would be one thing; but if it was intended to be a representation that it was valuable, then that is quite another thing. I called upon counsel to produce a case where an article had been represented in that manner, and I think it will hardly fall within the experience of any one that a man who says such a horse is a good horse, means thereby to assert any particular quality of the horse. The bearing that this has is, that if by saying that it was a good thing the defendant meant that it was a valuable thing, it was necessary for Bullard to prove, before he could recover, that Pearsall made the representation, that it was false, and that Pearsall knew it was false. This evidence was brought out upon that trial evidently for the purpose of showing that Pearsall knew the falsity of that which he had stated. Upon that trial, I apprehend, they did not seek to show that he had admitted anywhere that this machine was not a good thing, or that any other representation was not true, but they sought to show that he did know these things, because why? Because he had seen that machine tested in Granville, and knew just what it had done and what it failed to do, and that had taken place before this sale. If the machine had been to Granville before the sale and had proved a failure, having radical, inherent defects, and Pearsall was there and aware of the failure, that would be very important evidence for the jury in that case upon the question of his knowledge. It was claimed that the defendant knew these things because he

was there and saw them. The answer to that was that he was not there; he would not have them infer that he knew anything about it because that had not taken place; that when this sale took place, the seventeenth July, that machine had not been used at Granville. The defendant is here indicted, and it is alleged against him that that drill had been tested in Granville prior to the seventeenth July, when the sale was made, and that is the only question you are to consider, whether his testimony in that respect was true or false, that being the only assignment or allegation of perjury. That brings you to this question, did Pearsall, when he testified that that drill had not been used in Granville prior to that sale, testify to that which he knew to be false? As I said before, that is the assignment of perjury; beyond that you need not go.

To apply the principle I stated a moment ago, it is possible that Pearsall may have testified to that, that it was untrue and yet not be guilty of perjury, because as I said before he must testify to it willfully and corruptly, and it must be false and relate to a material matter; for if it has not those three elements, no matter how untrue it is, it is not perjury. This will bring you to the consideration of a question of fact. You will determine first from the evidence whether that machine was used there prior to the seventeenth July.

Mr. Jones, who is engaged in the quarry where they have occasion to drill, and where this machine was taken at some time and tested, states, when asked as to the time, that he thinks it was in June; he made no memorandum of it; he could not tell what time in June, and on cross-examination he could not tell that it was not perhaps in the fore part of July. He is asked with the view of ascertaining the correctness of his recollection as to the time he talked with Burdick, and he says he can't tell what year or month Burdick came, having made no memorandum. It appears that five or six other persons were there besides his brother, and none of them are called as witnesses. Jones was asked

whether he remembered his brother keeping the time and stating that the machine drilled three or four inches a min ute, and he said he did not; while other witnesses testify that such was the fact. Now it is for you to say whether in the case of men testifying like Pearsall—and I am now considering his testimony on the former trial—suppose Jones and he had testified on the former trial, Pearsall testifying that he knew what day he went there; that he made a memorandum that night and was positive; how would a jury have found? Would they have said that Pearsall had testified falsely as compared with the testimony of Jones? Mr. Johnson, who lives in Hartford, and who formerly lived in this county, testifies that he lived five or six miles from Argyle; that he and his wife went to Argyle for a bonnet in the month of June, and about a fortnight from that time they went down and got the bonnet; and that on one of these occasions, which he thinks was the first time, he met these men coming in the direction from Granville, having the drill in the wagon, and he there had some conversation with them. Johnson says he kept a diary, but he did not enter the day they went to get the bonnet, but did enter the day they came from Argyle with the bonnet and paid for it. He further testified that he made this memorandum in the evening of the day that he met them, when Inglesbee was there; and, I think, afterwards corrected it, saying it was not made that evening. Mr. Johnson, so far as appears, is a respectable man; he says he is about seventy years of age and has a poor recollection. He says he was not in the habit of going to Argyle very often; but when asked as to whether he did not go down twice that July, he would not swear he did not; and would not swear he did not go down five or six times that summer. He will not testify positively, but is quite confident in his recollection, and it is for you to say what weight you will give to his testimony. Because a witness asserts and assumes that his recollection is infallible it does not follow that the jury are to take his esti-

mate of it. That would be a very unsafe rule to be governed by as to any matter, and especially as to his testimony on the stand. The jury will consider the manner in which the testimony is given and the surrounding circumstances in determining the degree of credit to be given to a witness, statement. Mr. Inglesbee, who lives in Washington county, testifies that he was at work with his boy in a clover field; saw these men pass; had seen Pearsall once or twice before; saw them stop in front of Johnson's and then drive along, and I think he saw the drill. He testifies that he went to Johnson's that evening and had a conversation with Johnson about these men and the drill, and he thinks (and he is a man evidently who thinks pretty well of his own opinion) that it was in June, the day Johnson went to Argyle the first time. When inquired of as to the correctness of his recollection he says, not that he made any memorandum, not that he was aware that Johnson made any memorandum, but that he made no entry at all in relation to this transaction; and that he remembered it because on Monday he went to Sandy Hill and there signed a contract with Draper. If you see the connection between those transactions, and that it is a circumstance that enables him to recollect, you will give it all the weight it should have, why he selects that circumstance that he went the following Monday, why he does not say he remembers it because of something he did the following Tuesday, or what connection the two transactions have is for you to consider. Homer Inglesbee testifies that he was in the field; saw two persons go along; went to Johnson's that night and heard some conversation in relation to these men and the drill. He recollects the circumstance, not because he made any memorandum, for he swears he did not, but he remembers it because the next day he signed the contract as a witness. It was not a paper in relation to this transaction; yet he says he remembers that these men passed on that day, because the next day he signed a paper as a witness for the first time in his life. Whether that would enable him to

remember what took place that day I do not know. I can see why he remembers the fact of signing as a witness the first time, but I do not quite see—perhaps you may—why it would aid him in remembering anything else that occurred just before or just after, that had no connection with it. You will give that all the weight it is entitled to. Some question was made as to his testimony. You remember that he said he had not conversed with anybody about this matter from 1868 until last Monday, when his father was subpœnaed as a witness, at which time he had conversation with his father about it, and after coming here he talked with counsel. The father says in his affidavit the reason he remembered it was that he remembered it and his son remembered it.

The plaintiff in that action swears that the defendant admitted to him that he had been to Granville. That, of course, is the very thing in dispute. He has testified to it once before, and if he speaks from present recollection he is entitled to the same credit as any witness. But you will see that he is asserting what he then testified to, and Pearsall testified then and does now the opposite of that.

That is the substance of the testimony on the part of the people. There is a great deal of corroborating evidence which it is your duty to recall and give weight to. There are many things I have not mentioned which I do not omit because I deem them of no importance, but which you will remember.

I have spoken of the testimony of those witnesses who testify in relation to the time this machine was tried, whether before or after the sale. You might, and perhaps it may aid you in the determination of this question, stop at that point and take a review of the situation. As I said before, it was necessary for the people to prove these things, and you may well stop there and inquire whether the people have established to your satisfaction, and beyond a reasonable doubt, that when Pearsall testified that this machine had not been

tested at Granville until after the sale he testified to that which was true or untrue, and if untrue whether he knew it was untrue, and testified corruptly, and the matter was material. If on a review of the case you come to the conclusion that it has not been established that he testified falsely, then, of course, you need not go any further in the evidence, for the people must sustain the charge by proof, every man being presumed innocent until proved guilty, and the jury, before a conviction can be had, must be satisfied beyond a reasonable doubt that the charge is proved. If the innocence of the prisoner is consistent with any fact which you have determined to a certainty in your own minds, he is not to be convicted. I like that rule much better, and I will repeat it. If the innocence of the prisoner is consistent with the facts which you find from the evidence, then he is to be declared innocent.

Now, applying that rule in this case, what fact are you satisfied of and compelled to find, as reasonable men, which is inconsistent with the innocence of this prisoner, and that he did not try that machine in Granville prior to the sale? Outside of that rule you would have to find that some of these men who testified in relation to time, testified with that degree of assurance that brings your minds to the conclusion that that machine was tried before the sale. If Thompson or Inglesbee, or young Mr. Inglesbee or Jones are mistaken, if they may be mistaken, if your minds are not necessarily brought to the conclusion that what they have stated as to the time is the true time, it is perfectly consistent with his innocence. But if your minds are brought to that point and you can't get rid of it, of course, his innocence is inconsistent with the facts you are bound to find. If you come to the conclusion that the people have made out their case, and proved all the essentials that constitute the crime of perjury, of course, you come to consider the defense.

In relation to that, the defendant has put in two species of evidence. The drill which Wood brought on the packet

The People agt. Pearsall.

boat to Schuylerville is the drill which went to Granville. It is not pretended that the only other drill we have heard of, and which went to New Jersey, was ever sent to Granville. Wood testified that he brought this drill to Schuylerville on his packet on the twenty-fourth June, and that he helped Pearsall load it into his wagon, and Pearsall, being refreshed in his recollection, thinks he did. Pearsall testified —I will have to take it a little out of order—that he put it on his wagon, took it part way home, turned around and brought it back and put it in Hermance's barn. The day it arrived there, there is no dispute about. Hermance is called and swears that that drill was brought to his premises and put either in or near his barn on the twenty-fourth June; that it remained there from that time until the seventh July, when he went to New York, and when he returned on the eleventh it was gone. The witnesses for the people say that this drill was in Granville about the twenty-fourth or twenty-fifth June. If Hermance's testimony is true, that he saw this drill there, and that other members of his family saw it—if Hermance is correct, that drill was not in Granville at the time. There were other witnesses who saw it and who might have been called. It is suggested that if that drill had been there the defendant would have called other witnesses. Perhaps he would and perhaps he would not. It is proved by Hermance that the drill was there, and perhaps defendant's counsel did not think it necessary to call other witnesses to prove that it was there when nobody had contradicted Hermance. If Hermance is not very much mistaken, or has not testified falsely, then the drill could not have been in Granville at the time it is claimed to have been. Pearsall; himself, is a witness, and I speak in regard to his testimony as to where the drill was. He swears he took the drill to Hermance's barn and that it remained there until the eleventh. If Pearsall's testimony is true, that the drill remained there from June twenty-fourth until July eleventh, then it could not have been in Granville.

There is another kind of evidence, that is the testimony of the two Vandenburghs, who swear, and they give the reason why they know, because Vandenburgh had a lame hand, injured in June, and he caught cold the fourth of July and remained in the house two or three weeks. They swear that Bullard came to the house, and two or three days after he was there again, and said he had bought an interest in a patent, and Pearsall and Thompson were going to take it to Granville.

If that is true, it secures two purposes; first, to show that the drill was there up to that time, and also to contradict Bullard, for Bullard says he did not say so. They testify to some other facts; they say that Thompson and Pearsall went past their house subsequent to that conversation, which was in July, going in the direction of Granville; that they were together in a wagon and had this drill in the wagon, and that that was the only time they ever saw them going that way, and the only time they ever saw them in a wagon together. Thompson and Pearsall testify that they were not in a wagon together again that summer. If the Vandenburghs are correct in what they say in relation to Bullard's conversation and what they saw there, then, of course, the drill was not tried in Granville in June, as claimed.

Then there is the testimony of Thompson, who swears that he was interested in this drill, and knows that he went with Pearsall to Granville and was present when the drill was tried in Granville, and that it was on the 24th July; that he never was at Granville at any other time for the purpose of trying that drill, and never was with Pearsall in a wagon with the drill but on that occasion. He swears that he soon afterwards made a memorandum showing that was the time. He swears that they crossed the river at Fort Edward and stopped at Fort Ann for dinner and registered there. He swears he saw Pearsall write their names, and after dinner they went to Granville and there tried the experiment on the day succeeding, which would be July 25, instead of June.

Pearsall testified to the same thing, with a little more minutia. He also testified that on his return from Granville he made a memorandum, which is produced, it thus appearing that such a memorandum was made.

Pearsall is the party indicted; the law allows him to be a witness. You will take into consideration his manner of testifying, the surroundings of the man and the circumstances of the case, as well as his interest in the matter.

It is fair to say that Bullard was a witness on the other trial; is the complainant here, and no doubt has some feeling; it is for you to say how much his feeling towards Pearsall and the result of that trial and the loss it is claimed he sustained, $3,000, affect his testimony. These are legitimate matters for the jury to consider, how much the feelings of these witnesses affect their testimony.

There is another kind of evidence. The register which was kept at the hotel at Fort Ann is produced, and upon which appears written, in the handwriting of Pearsall, his name and that of Thompson. Pearsall testified that he did register both their names. Thompson swore to the same thing, that Pearsall registered both their names. Mr. Wing, who was the proprietor of the hotel, swears that this was the register kept there; that he is not aware of any change in its condition from that time until this; that he broke up keeping the hotel and went several places, but the register was kept in his family. He swears that Jackway came and asked him for the register, and he gave it to him; Jackway, a respectable lawyer, against whom nothing can be said, says he procured this register at the request of Pearsall and kept it until Pearsall came; that then he and Pearsall sat down and examined the register, and the names, as shown here to-day, were upon it when he opened it with Pearsall. It is said that Pearsall could have gone and made these entries; it is for you to say whether he could have gone and got that book and made these entries, and Mr. Wing or his wife or anybody else who had the custody of the book never have heard of it. It is for

The People agt. Pearsall.

you to say whether he would have made them when he pro-
cured Jackway to ascertain where it was and obtain it.   The
register has been submitted to you, and you may take it again
and see from the position of these names and the ink with
which they are written whether it does not support the testi-
mony of Pearsall.   It is said that these names are written near
the foot of the page; you will look on other pages and see if
names are not written as near or nearer the bottom.   It is
said that there are different kinds of ink.   Wing testified that
he had different kinds of ink, and if you look on other pages
will see different kinds of ink, and perhaps the same kind of
ink.

I have gone through the testimony so far as I deem it
important.   It is your duty to recollect all this evidence.
This is an important matter, and you should examine it care-
fully and candidly, and if you are satisfied beyond a reasona-
ble doubt that this defendant is guilty, it is your duty to find
him guilty.

The jury rendered a verdict in favor of defendant.*

* If the verdict of the jury in this case is correct, it leaves John H. Bul-
lard (a respectable man), the plaintiff in the civil action and the complain-
ant in this case, in the unenviable position of having committed willful
and corrupt perjury on three several occasions—once on the trial in the
civil action, again before the grand jury who found this indictment, and
again on the trial of this case.   For there is no alternative or chance for
mistake; either Bullard committed perjury three times, as stated, or the
defendant Pearsall committed perjury twice, once on the trial of the civil
action and again on the trial of this case.   Every one who reads this
remarkable trial will judge for himself which it is.

If there could be a Code devised which would make parties litigant
honest enough to swear to the *truth*, whether diametrically opposed to
their interests and feelings or not, the rule of the statute allowing parties
to be witnesses in their own behalf, in actions for or against themselves,
would appear to be of some practical value.   But as it is, this statute
seems to be a standing temptation to the commission of the crime of per-
jury, which human nature in its weakness, in most cases, perhaps, is
unable to resist.—REP.